**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

EBERSPAECHER NORTH AMERICA, INC.,

    Plaintiff,

v.                                                         Case No. 12-11045

NELSON GLOBAL PRODUCTS, INC.,

    Defendant.
                                                      /

**ORDER VACATING "ORDER TERMINATING AS MOOT
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION,"
GRANTING PLAINTIFF'S "MOTION FOR PRELIMINARY INJUNCTION,"
AND DENYING PLAINTIFF'S "MOTION FOR ENTRY OF STATUS QUO ORDER"**

Plaintiff Eberspaecher North America, Inc., a Tier-1 automotive supplier, initiated this action on March 8, 2012, against Defendant Nelson Global Products, Inc., one of its Tier-2 suppliers, after Defendant indicated that it would cease supply of eighteen parts unless Plaintiff agreed to a price increase. As Defendant had identified April 1, 2012, as the date when shipments of the parts would stop, Plaintiff filed a motion for a preliminary injunction on March 20, 2012. The court convened a hearing on the motion on April 2, 2012, during which counsel for the parties appeared to agree to an interim arrangement that would be put in place until the court made a final determination on Plaintiff's claim for a permanent injunction. As a result, on April 5, 2012, the court terminated as moot Plaintiff's motion for a preliminary injunction, noting that the parties had consented on the record to a conditional resolution, the details of which would be reduced to writing and placed on the court's docket by counsel.

In subsequent days, however, counsel's negotiation of the terms of the stipulated resolution broke down. It seems that, while counsel for both parties had consented in principle to an arrangement under which Defendant would continue supplying parts to Plaintiff at the original, lower price if Plaintiff would deposit the difference between that price and the higher, requested price into an escrow account, they have reached an impasse regarding the method for funding the escrow account. On April 10, 2012, Plaintiff filed a "Motion for Entry of Status Quo Order," asking the court to impose their suggested method of payment. Defendant responded in short order, and the court conducted two off-the-record telephone conferences with counsel on April 11, 2012, and April 12, 2012, in an attempt to help bridge the differences between the parties' positions. Later in the day on April 12, 2012, in a telephone conference held on the record, counsel informed the court that the parties were unable to come to an agreement, and they would like the court to decide the following questions: (1) whether Defendant must continue shipment of the parts at the lower price pending a final disposition of the case on the merits; and (2) if so, whether and on what terms Plaintiff would escrow the excess amount Plaintiff would be obligated to pay under Defendant's requested price increases.

To facilitate a resolution of these questions, the court will vacate its previous order terminating Plaintiff's motion for a preliminary injunction. Upon considering the matter on the briefs submitted on that motion, the testimony taken and arguments made at the preliminary injunction hearing, and the papers submitted on Plaintiff's "Motion for Entry of Status Quo Order," the court determines a further hearing is not necessary. *See* E.D. Mich. LR 7.1(f)(2). For the reasons that follow, the court will grant Plaintiff's

motion for a preliminary injunction requiring Defendant to continue shipments to Plaintiff of the disputed parts on the terms set forth in Plaintiff's Purchase Orders. As security for these shipments, the court will also order Plaintiff to make monthly payments into a court-controlled escrow account equal to the accrued price difference it will owe Defendant, should Defendant prevail on the merits. In light of this disposition, the court will deny Plaintiff's "Motion for Entry of Status Quo Order," which advocates different terms for the maintenance of the escrow account prior to a final disposition.

## I. BACKGROUND

Plaintiff is a Tier-1 automotive supplier that provides exhaust systems to original equipment manufacturers ("OEMs") including General Motors, Mercedes, and BMW. (Montean Aff. ¶ 2, Dkt. # 8-3; Dougald Aff. ¶ 4, Dkt. # 15-3.) Defendant, a Tier-2 supplier, provides outlet, center muffler inlet, intermediate, and tail pipe to Plaintiff for use in manufacturing these exhaust systems. (Montean Aff. ¶ 2; Dougald Aff. ¶ 4.)

The supply relationship between Plaintiff and Defendant is governed by a series of Purchase Orders executed by the parties at various times throughout 2008 to 2011. The Purchase Orders purport to be requirements contracts specifying the price Plaintiff would pay for each part. (Montean Aff. ¶ 6; Dougald Aff. ¶ 4.) Under this system, Plaintiff places specific orders with Defendant by way of periodic releases designating a quantity of parts to be delivered on a particular date. (Montean Aff. ¶ 3; Dougald Aff. ¶ 8.) Then, Plaintiff must pay Defendant in full within either 45 or 60 days. (*See, e.g.*, 12/15/09 Purchase Order 1, Dkt. # 8-4, at 2; 8/31/10 Purchase Order 1, Dkt. # 8-4, at 5.) Although several of the Purchase Orders appear open-ended as to their termination date, Plaintiff alleges that they are all currently in effect and will remain valid over the life

of the vehicle program for which the parts are manufactured. (Montean Aff. ¶ 4; Montean Supp. Aff. ¶ 5, Dkt. # 16-1; *see also* 2007 Terms & Conditions § 3, Dkt. # 8-5; 2011 Terms & Conditions § 4, Dkt. # 8-6.)

Sometime in 2011, Defendant realized that it was losing money on at least eighteen of the parts it produces for Plaintiff. (Dougald Aff. ¶¶ 9, 13.) On November 23, 2011, Defendant provided a list of proposed price increases on these parts, which it planned to implement on January 1, 2012. (*Id.* ¶ 16.) Plaintiff and Defendant discussed the issue at a meeting on January 4, 2012, but Plaintiff was not receptive to Defendant's request for a price adjustment. (*Id.* ¶ 17.) As a result, on February 13, 2012, Defendant sent Plaintiff a letter indicating that it would stop shipment of parts to Plaintiff on April 1, 2012, unless Plaintiff agreed to pay the price increase. (2/3/12 Letter, Dkt. # 8-7.) Plaintiff filed this suit on March 8, 2012, averring that Defendant's letter constituted an anticipatory breach of contract and seeking specific performance of the Purchase Orders. Plaintiff alleges that the price demanded by Defendant would result in the payment of approximately $1,000,000 more per year than the current prices in the Purchase Orders. (Montean Aff. ¶ 5.)

## II. STANDARD

Federal Rule of Civil Procedure 65(a) allows a court to enter a preliminary injunction if notice is given the adverse party. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A plaintiff seeking a preliminary injunction must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance

4

of equities tips in his favor; and (3) an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). No one factor is dispositive, as the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987). The preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24 (citing *Munaf v. Green*, 553 U.S. 674, 689-90 (2008)).

### III. DISCUSSION

In their briefs and at oral argument, Plaintiff and Defendant presented competing claims as to whether the four preliminary injunction factors weigh in favor of their respective positions. After considering each factor, the court determines that the balance tips in favor of Plaintiff and will enter a preliminary injunction requiring Defendant to continue shipping parts at the original price, consistent with the relevant Purchase Orders. Nevertheless, the court will also order Plaintiff to give security for the shipments received in the form of monthly deposits to an interest-bearing escrow account of the monetary difference between the price designated in the Purchase Orders and the increased price Defendant has demanded for the parts.

#### A. Likelihood of Success on the Merits

"[I]n seeking a preliminary injunction, a federal plaintiff has the burden of establishing the likelihood of success on the merits." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 546 n.2 (6th Cir. 2007). "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*,

119 F.3d 393, 402 (6th Cir. 1997) (citing *Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 261 n.4 (6th Cir. 1977)). "However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)); *see also Brandeis Mach. & Supply Corp. v. Barber-Greene Co.*, 503 F.2d 503, 505 (6th Cir. 1974) ("In determining whether sufficient likelihood of success exists as one of the necessary conditions to preliminary injunctive relief, the trial court was required to 'satisfy itself, not that the plaintiff certainly has a right, but that he has a fair question to raise as to the existence of such a right.'" (quoting *Am. Fed'n of Musicians v. Stein*, 213 F.2d 679, 683 (6th Cir. 1954))).

The crux of the parties' dispute on the merits is whether, as Plaintiff argues, the Purchase Orders for the parts at issue constitute enforceable contracts, which Defendant anticipatorily breached by threatening to stop shipment unless Plaintiff agreed to a higher purchase price. Defendant asserts that, because the Purchase Orders do not set forth a quantity of parts to be supplied, they are invalid under Michigan's codification of the Uniform Commercial Code ("UCC") statute of frauds, *see* Mich. Comp. Laws § 440.2201(1), which "requires that the quantity term of a contract for the sale of goods be in writing before the contract is enforceable," *Lorenz Supply Co v. Am. Standard, Inc.*, 358 N.W.2d 845, 846-47 (Mich. 1984). Plaintiff responds that the Purchase Orders "measure[] the quantity by . . . the requirements of the buyer," Mich. Comp. Laws § 440.2306(1), and are therefore enforceable under the UCC as requirements contracts, *see In re Frost*, 344 N.W.2d 331, 335 n.2 (Mich. Ct. App. 1984)

("[R]equirements contracts governed by § 2306 of the Uniform Commercial Code could often not specify a quantity with mathematical exactness yet are still enforceable contracts . . . .").

The relevant language of the Purchase Orders provides enough support for Plaintiff's position to demonstrate the requisite degree of likely success on the merits. Each Purchase Order states that "[t]his Purchase Order is a Requirements Contract" and is subject to Plaintiff's 2007 or 2011 Terms and Conditions. (*See, e.g.*, 12/15/09 Purchase Order 3.) The Terms and Conditions confirm that the Purchase Orders are "requirements contract[s] under which [Defendant] is required to supply [Plaintiff's] requirements," defining "requirements" as "those quantities ordered by [Plaintiff] from time to time, as evidenced by written releases issued by [Plaintiff] from time to time." (2007 Terms & Conditions § 2(c); 2011 Terms & Conditions § 2(c).) Defendant contends that, notwithstanding their use of the word "requirements," the Purchase Orders are not true requirements contracts because they define that term solely in terms of what Plaintiff orders in subsequent releases. However, the agreements at issue in the cases cited in support of this assertion are sufficiently distinguishable from the terms of the Purchase Orders to create a colorable issue as to whether the later are, in fact, requirements contracts.[1]

---

[1]*See Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 47 F.3d 1167, at *2 (6th Cir. 1995) (unpublished table decision) (finding no requirements contract when contract stated that "Seller agrees to furnish Buyer's requirements for the goods or services covered by this Purchase Order *to the extent of and in accordance with* . . . Buyer's written instructions," "Buyer shall have no obligation to honor invoices for goods or services fabricated, rendered, or delivered other than according to the . . . written instructions of Buyer," and "Buyer shall be entitled to make other purchases at its discretion in order to assure its production operations and maintain reasonable

7

Neither do Defendant's other arguments prevent Plaintiff from showing a substantial question on the merits. Defendant maintains that the Purchase Orders lack mutuality because Plaintiff reserved the right to terminate them for convenience and because they have impermissibly vague end dates. But if, as Plaintiff maintains, the Purchase Orders are true requirements contracts, Plaintiff's duty to purchase its "actual . . . requirements as may occur in good faith," Mich. Comp. Laws § 440.2306(1), provides a mutuality of obligation, *Johnson Controls, Inc. v. TRW Vehicle Safety Sys., Inc.*, 491 F. Supp. 2d 707, 719 (E.D. Mich. 2007).

Defendant also avers that Plaintiff has both consistently failed to pay invoices on time and made deductions to invoices without explanation, (Dougald Aff. ¶ 10), which conduct constitutes a substantial breach precluding Plaintiff from demanding Defendant's performance, *see Ehlinger v. Bodi Lake Lunber Co.*, 36 N.W.2d 311, 316 (Mich. 1949) ("He who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform." (internal quotation

---

alternative sources of supply"); *Johnson Elec. N. Am. v. CRH N. Am., Inc.*, No. 10-13184, 2011 WL 6016527, at *3 (E.D. Mich. Dec. 2, 2011) ("There is no language in the Scheduling Agreements or Releases that the contract . . . is on a requirements basis . . . ."); *Harris Thomas Indus., Inc. v. ZF Lemforder Corp.*, No. 3:06CV190, 2007 WL 3071676, at *3 (S.D. Ohio Oct. 19, 2007) (determining that blanket purchase order was not requirements contract when it "ma[de] clear that [buyer] never guaranteed to buy the target quantity/estimated annual usage that would be listed on the [purchase order and buyer instead] was directed to see the Scheduling Agreement Releases for product quantities and dates for delivery"); *MacSteel, Inc. v. Eramet N. Am.*, No. 05-74566, 2006 WL 3334019, at *6 (E.D. Mich. Nov. 16, 2006) (holding that term "additional material" is not a quantity term that satisfies Michigan's statute of frauds); *Acemo, Inc. v. Olympic Steel Lafayette, Inc.*, No. 256638, 2005 WL 2810716, at *4 (Mich. Ct. App. Oct. 27, 2005) (unpublished per curiam decision) (finding no valid quantity term when contract specified only that "the Seller agrees to sell to the Buyer such quantities of the Products as the Buyer may specify in its purchase orders, which the buyer may deliver at its discretion").

marks omitted)). A "complete failure of consideration" may excuse performance. *McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 343 (Mich. 1964). Nevertheless, late payment, or even non-payment, of some invoices would not excuse Defendant from its obligation to perform the contract, as any such breach would not "effect[] such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible," *id.*; *see Coupled Prods. LLC v. Component Bar Prods., Inc.*, No. 09-12081, 2012 WL 954646, at *3 (E.D. Mich. Mar. 21, 2012) ("Courts have held that failure to timely meet payment does not constitute a substantial breach." (citing *Baith v. Knapp-Stiles, Inc.*, 156 N.W.2d 575 (Mich. 1968))). The court is satisfied that Plaintiff has raised a fair question as to its entitlement of relief on its claims, and this factor weighs in favor of issuing a preliminary injunction.

### B. Irreparable Harm

"[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). "'The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'" *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

Plaintiff asserts that, if Defendant stops shipment of the parts, it will be unable to continue manufacturing the automotive exhaust systems for the OEMs, resulting in the

9

loss of customer goodwill. *See Basicomputer*, 973 F.2d at 512 ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."). Such a result may have more dire consequences as well. This court has held in a similar case that a cessation of shipments in the automobile industry can wreak particular havoc. *See Intertek Sys., LLC v. Multimatic, Inc.*, No. 04-CV-73661-DT, at 6 (E.D. Mich. 2004) (order granting preliminary injunction), Dkt. # 8-2. Because, for the sake of efficiency, car manufacturers typically do not keep large reserve banks of parts, "component parts are often incorporated into a finished product within a few hours of their delivery." *Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.*, 749 F. Supp. 794, 798 (E.D. Mich. 1990). As a result, "[a] supplier's failure to make scheduled shipments may have immediate and dramatic consequences," *id.*, in that "any interruption in [a manufacturer's] production schedules might result in a shut down of certain assembly lines while [it] obtained new suppliers and made the necessary arrangements for new production tooling and dies," *In re Autostyle Plastics, Inc.*, 216 B.R. 784, 788 (Bankr. W.D. Mich. 1997). These shut downs, in turn, might cause the layoff of innumerable employees and a damage claim against the supplier along the order of millions of dollars a day. *Id.*; *see also Gen. Motors Corp. v. Paramount Metal Prods. Co.*, 90 F. Supp. 2d 861, 875 (E.D. Mich. 2000).

Defendant attempts to overcome this seemingly substantial threat of irreparable harm by claiming that Plaintiff can avoid it by paying the increased price requested by Defendant and thereby guaranteeing shipment of all parts. On this point, Defendant cites *Eberspaecher North America, Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592 (E.D.

Mich. 2008), a similar case in which the court declined to issue the instant Plaintiff a preliminary injunction against a threatened shipment stoppage by another of its Tier-2 suppliers. There, the court reasoned that, even though the defendant was the only possible supplier of the relevant parts, Plaintiff would not suffer irreparable injury because it could "cover" by paying the inflated purchase price demanded by the defendant and later sue for damages. *Id.* at 600-02; *see* Mich. Comp. Laws § 449.2715(2)(a) (excluding from a buyer's consequential damages any loss that could reasonably have been prevented by cover).

The court does not find *Van-Rob* persuasive. The UCC defines "cover" as "any reasonable purchase of or contract to purchase goods *in substitution for* those due from the seller." Mich. Comp. Laws § 440.2712(1) (emphasis added). In the court's view, this must mean that a buyer is obligated to search for an alternative source of supply other than the breaching seller. Otherwise, the obligation to cover would reward a breaching seller's efforts at extorting a price increase by mandating that the buyer pay that price, at least for time. This would be a troubling result, particularly in cases where, as here, there are questions about the seller's financial viability. (*See* Montean Supp. Aff. ¶ 6.)

Additionally, Defendant argues that the parade of horribles touted by Plaintiff is insufficiently speculative to support a finding of irreparable harm. Contrary to this assertion, the potentially catastrophic effects of a disruption in the supply chain of automotive parts is well established in the case law of this court. *See, e.g.*, *Kelsey-Hayes Co.*, 749 F. Supp. at 798. Plaintiff has made a sufficient showing of irreparable harm to justify a preliminary injunction.

### C. Balance of Equities and Public Interest

The final two considerations require the court to balance the irreparable harm alleged by Plaintiff against any harm that Defendant or the general public will suffer as a result of a preliminary injunction. The only concrete, countervailing harm Defendant advances is the monetary losses it will continue to absorb if forced to keep supplying Plaintiff at the prices reflected in the Purchase Orders, when it would otherwise be free to allocate its resources to procuring more profitable business. (*See* Dougald Aff. ¶¶ 14-15.) This pales in comparison to the potential production shut downs and work stoppages that may result if Defendant stops shipping to Plaintiff. *See Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172, 1182 (D. Kan. 1988). Moreover, it is in the public's interest to preventing such occurrences, which could have far-reaching consequences. Thus, all four preliminary injunction factors weigh in favor of Plaintiff. The court will order Defendant to continue shipment of the disputed parts to Plaintiff according to the terms laid out in the relevant Purchase Orders, until such time as this case is resolved on the merits or until further order of the court.

### D. Escrow Payments

Rule 65(c) specifies that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The court deems it equitable to implement an arrangement similar to that contemplated by counsel when they tentatively agreed to resolve this matter by stipulation. The court will establish an interest-bearing escrow account into which

Plaintiff must pay the amount of the difference between the Purchase Order price and the increased price Defendant has requested for all parts shipped on or after April 1, 2012. Such payments will be made on a monthly basis, as outlined below, and will continue until a final resolution of this litigation. The court considers these payment terms preferable to those outlined in Plaintiff's "Motion for Entry of Status Quo Order" and will therefore deny that motion.

## IV. CONCLUSION

In accordance with the above analysis, IT IS ORDERED that the "Order Terminating as Moot Plaintiff's Motion for Preliminary Injunction" [Dkt. # 20] is VACATED.

IT IS FURTHER ORDERED that Plaintiff's "Motion for Preliminary Injunction" [Dkt. # 8] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's "Motion for Entry of Status Quo Order" [Dkt. # 23] is DENIED.

Finally, IT IS ORDERED that Defendant shall continue production and shipment to Plaintiff of the parts at issue, under the terms of the governing Purchase Orders, until such time as this case is resolved on the merits or until further order of the court. Plaintiff shall place the monetary difference between the price paid for each shipment under the Purchase Orders and the higher price asked for by Defendant into an interest-bearing escrow account. Plaintiff is DIRECTED to deposit this amount for all shipments invoiced to Plaintiff within a calendar month, beginning on **April 1, 2012**, with the Clerk of Court, no later than the **fifth business day of the following month**. Plaintiff shall

13

include with each deposit a statement detailing the parts and shipments accounted for in that deposit. Pursuant to Eastern District of Michigan Local Rule 67.1, "[t]he Clerk of Court shall accept only cash, certified check, cashier's check or money order for deposit in an interest-bearing account." The Clerk of Court is hereby DIRECTED to deduct from the account any fee authorized by the Judicial Conference of the United States.

                                              s/Robert H. Cleland
                                              ROBERT H. CLELAND
                                              UNITED STATES DISTRICT JUDGE

Dated: April 13, 2012


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, April 13, 2012, by electronic and/or ordinary mail.

                                              s/Lisa G. Wagner
                                              Case Manager and Deputy Clerk
                                              (313) 234-5522